**PREMIER WINE & SPIRITS, a South Dakota corporation, Plaintiff–Appellant,**

v.

**E. & J. GALLO WINERY, a California corporation, Defendant–Appellee.**

**No. 86–15043.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 15, 1987.

Decided May 9, 1988.

As Modified June 3, 1988.

---

Thomas J. Welk and Michael S. McKnight, Boyce, Murphy, McDowell & Greenfield, Sioux Falls, S.D., for plaintiff-appellant.

G. Kip Edwards (argued) and Matthew D. Powers of Orrick, Herrington & Sutcliffe, San Francisco, Cal., for defendant-appellee.

Before FLETCHER, WIGGINS and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Premier Wine & Spirits (Premier), a South Dakota corporation, brought suit against E. & J. Gallo Winery (Gallo), a California corporation. Jurisdiction depended on diversity of citizenship. The suit was originally brought in South Dakota and transferred to the Eastern District of California pursuant to a provision in the contract between Premier and Gallo. Premier claimed breach of the implied covenant of good faith and fair dealing, wrongful termination of its distributorship by Gallo, violation of the California Franchise Investment Law, the California Franchise Relations Act, and the South Dakota Franchise Act, and breach of fiduciary duty by Gallo; it further contended that the termination clause in the distributorship agreement was unconscionable. The district court gave summary judgment for Gallo. 644 F.Supp. 1431. We affirm.

## FACTS

Premier is a wholesaler of liquor in South Dakota with annual sales as of 1983 in excess of $8 million. Gallo is a producer of wines which are nationally distributed. Beginning in 1959 Gallo agreed that Premier should distribute its wines in South Dakota. The agreement at issue here was entered into on October 17, 1977. It provided for Premier to distribute Gallo's Muscatel, White Port, Port, Sherry, Cream Sherry, CPD Sherry, O.D. Tawny Port, O.D. Livingston Cream Sherry, O.D. Very Dry Sherry, Thunderbird, Sweet Vermouth, Dry Vermouth, Ruby Cabernet, Barbera, Zinfandel, Sauvignon Blanc, Riesling, Chenin Blanc, French Colombard, Rose, Burgundy, Hearty Burgundy, Sauterne, Rhine, Chablis Blanc, Pink Chablis, Red Rose, Vin Rose, Rhine Garten, Chianti of California, Paisano; Carlo Rossi Burgundy, Chablis, Pink Chablis, Vin Rose, Light Chianti, Spanada, Tyrolia, Madria–Madria Sangria, Pear Ripple, Red Ripple, Pagan Pink Ripple; Boone's Farm Apple, Strawberry Hill, Country Kwencher, Tickle Pink, Wild Mountain; Andre de Montcort Sparkling Burgundy, Cold Duck, White Champagne, Pink Champagne; and E & J Brandy. The wines were to be distributed in South Dakota from Aurora to Zieback. Premier was not bound to carry only Gallo wines, and Gallo was not bound to Premier as its exclusive distributor.

The agreement—apart from the wines and locations a standard form agreement prepared by Gallo—set out that the contract was "personal in nature," "not assignable" and terminable by either party's giving 30 days advance written notice. Gallo was further permitted to terminate "immediately" if there was "any change

whatsoever in ownership or management of Premier." The contract said that it "set forth the entire agreement of the parties" and that no oral agreement could vary any term. It was entered into under the laws of California and to "be construed thereunder." Any cause of action arising between the parties "under this agreement or otherwise" was to be brought only in a court having jurisdiction over Gallo and with the venue of Modesto, California.

In November 1980, Premier hired a merchandise manager for the Gallo line alone and replaced him in 1981 with Shane Viger to perform the same function; in 1982 Premier hired a wine restaurant manager to promote the Gallo line alone in sales to restaurants. These employees of Premier were hired at Gallo's request.

In 1977 Premier entered into a consent order with the state of South Dakota by which it bound itself not to give "kickbacks" to retailers. Wholesalers sometimes arrange the wines of retailers, a practice known as "setting," not without benefit to the arranging wholesaler. At that time Premier did not understand that the term kickback embraced the practice of setting the premises of a retailer. On March 24, 1982 a directive from the office of the Attorney General and the South Dakota Department of Revenue informed liquor wholesalers in South Dakota that stocking shelves on behalf of a retailer constituted "the offering of something of financial value to induce the sale of an alcoholic beverage." If this practice were done "for the purpose of illegally inducing the purchase of a certain wholesaler's products," the wholesalers were informed, it could be punished by revocation of the wholesale license. According to affidavits of Gary Viger and other Premier employees, Gallo sought to have Premier set shelves in violation of the directive and therefore in apparent violation of the consent order.

In 1983 Chester Matteson, the president of Premier in 1977 and the signatory on the 1977 agreement, sold all his stock in Premier. In 1984 Gallo gave Premier a written notice of termination in 30 days, noting that it could also have terminated immediately. Thereafter, Gallo products formerly distributed by Premier were distributed by Famous Brands Distributing Co. Premier began distributing Inglenook Wines on behalf of Hublein and continued to distribute the wines of Paul Masson and Taylor California Cellars that it had carried even before the termination.

The current president of Premier, Gary Viger, testified in a deposition that it was his opinion that Gallo discontinued Premier because it wanted to be with Famous Brands, that the principal of Famous Brands was a close friend of the Gallos, and that he was unaware of any other reason for Gallo's decision to move from Premier to Famous Brands. John R. McDowell, Premier's general counsel, and an officer, director and shareholder of Premier since 1963, also testified that he believed Premier was terminated because of Gallo's desire to do business with Famous Brands; he added that there was a lack of harmony between Viger and the Gallo representatives. Chester Matteson testified that he believed the termination occurred because of the change in ownership. However, Premier now argues that a jury could infer that Premier was terminated for refusing to respond to Gallo's requests to set the shelves of retailers.

## PROCEEDINGS

On September 12, 1984 Premier brought suit in the district court for South Dakota. Over Premier's objection the suit was transferred to the Eastern District of California pursuant to the venue provision in the distributorship agreement. The district court gave summary judgment against Premier on all of its claims. On appeal Premier has abandoned the claims of violation of the California Franchise Relations Act, violation of the California Franchise Investment Act and unconscionability in the termination clause. It appeals, alleging that it is entitled to a trial under California law for breach of the implied covenant of good faith and fair dealing and the tort of wrongful termination; that it was a franchisee under South Dakota law; and that a

fiduciary duty was owed it under South Dakota law, which was breached by its termination.

## ANALYSIS

■ 1. *The Tort Issue.* Premier has set out as distinct claims Gallo's alleged breach of the covenant of good faith and fair dealing and Gallo's alleged tortious termination of the contract. The elements of the two tort causes of action sometimes overlap and in this case are not distinguishable. *See Tameny v. Atlantic Richfield Co.,* 27 Cal.3d 167, 179 n. 12, 610 P.2d 1330, 1337, n. 12, 164 Cal.Rptr. 839, 846 n. 12 (1980).

The parties have agreed that California law applies as to the alleged tort. Although the status conference report indicates that they were in disagreement as to the applicable law and although no stipulation to the contrary appears in the record, the district judge, in his conclusions of law, states that the parties agree that California law applies. The briefs filed in this court proceed on that assumption. Accordingly, we turn to California law.

California pioneered in the creation of the tort of wrongful breach of a contract. The tort has been recognized in two contexts, that of employer and employee and that of insurer and insured. The specific tort of wrongful discharge for refusal to break the law has been recognized only in the employer-employee relation. *Tameny v. Atlantic Richfield,* 27 Cal.3d 167, 610 P.2d 1330, 164 Cal.Rptr. 839 (1980). Although the principle of *Tameny* is logically capable of extension beyond the employment relation, there is a consideration that makes it peculiarly apt in that setting and not in a broader context: it is normal for an employee to take directions from his employer. In the ordinary commercial world, the control of one party's actions by another is not so usual or so close. It is hard to forecast that California would extend the principles of *Tameny* to the relation of producer and nonexclusive wholesaler.

Premier asks us to go further than we have hitherto been willing to go in the

absence of "further guidance from the California courts." *See Consolidated Data Terminals v. Applied Digital Data Systems, Inc.,* 708 F.2d 385, 400 (9th Cir.1983). Since *Consolidated Data,* California has declined to extend such tort liability to the "ordinary commercial contract," lest "tort remedies ... intrude upon the expectations of the parties." *Seaman's Direct Buying Service, Inc. v. Standard Oil Company of California,* 36 Cal.3d 752, 769, 686 P.2d 1158, 1166–67, 206 Cal.Rptr. 354, 362–3 (1984). *Seaman's* does leave open the possibility that a tort will be recognized in breaching contracts other than those of employment or insurance—contracts "characterized by elements of public interest, adhesion, and fiduciary responsibility." *Id.* at 768, 686 P.2d at 1166, 206 Cal.Rptr. at 362. We do not, however, detect elements of public interest or fiduciary relation that would make the distributorship close to one of employment or insurance. California does not recognize in this situation a tort action for either wrongful termination or breach of covenant.

2. *The Franchise Issue.* Premier asks us to find that the salaries paid to its employees who promoted Gallo products were an indirect franchise fee under the South Dakota Franchise Act and that therefore Gallo violated the Franchise Act by failing to register as a franchisor. It is unnecessary for us to decide this contention by construing the Franchise Act. Section 49 of the Act limits liability to the franchisee "who may sue for damages caused thereby." S.D. Codified Laws Ann. § 37–5A–83. Premier has not shown that it incurred any damages by this alleged failure to register.

■ Premier sees a further significance in its contention that Gallo was a franchisor in that a fiduciary duty might be thereby imposed upon it. A broad holding of the Eighth Circuit supports this theory. *Arnott v. American Oil Co.,* 609 F.2d 873, 881 (8th Cir.1979), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980). But the Eighth Circuit has retreated from this position and indicated that it did not

mean that in South Dakota a franchise relationship alone will create a fiduciary relation. *See Bain v. Champlin Petroleum Co.,* 692 F.2d 43, 48 (8th Cir.1982). Premier makes no other showing that fiduciary duties existed, and the bare franchisor/franchisee relation which it claims is not enough to establish such obligations between a producer and a non-exclusive distributor.

AFFIRMED.